UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| ASHLEY MORENO,<br><br>     Plaintiff,<br><br>     v.<br><br>STATE OF IDAHO, IDAHO STATE POLICE, RYAN BLACKHAWK, individually and in his capacity as a police officer for Idaho State Police; PAUL OLSEN, individually and in his capacity as a police officer for Idaho State Police; and LT. JOHN KEMPF, individually and in his capacity as Idaho State Police supervisor of Blackhawk and Olsen,<br><br>     Defendants. | Case No. 4:15-cv-00342-BLW<br><br>**MEMORANDUM DECISION AND ORDER** |

**INTRODUCTION**

Pending before the Court are cross motions for summary judgment. *See* Dkts. 25, 42, 43. The Court heard oral argument on the motions on February 13, 2017 and took the matters under advisement. For the reasons explained below, the Court will deny Plaintiff's Partial Motion for Summary Judgment re Tracking Device (Dkt. 43), grant Defendants' Motion for Summary Judgment (Dkt. 25), and grant in part and deny in part Defendants' Partial Motion for Summary Judgment (Dkt. 42).

## BACKGROUND

**1.     Factual Background**

Plaintiff Ashley Moreno brings suit against the State of Idaho, Idaho State Police ("ISP), and three ISP officers—Ryan Blackhawk, Paul Olsen, and John Kempf—relating to the warrantless installation and use of a GPS tracking device and Moreno's subsequent arrest and interrogation.

On August 21, 2013, Idaho State Police detective Olsen had been informed that Ryan Dalley, a friend or acquaintance of Moreno, had missed several probation check-ins. *Def. SOF* ¶ 3, Dkt. 42-1. Dalley's probation officer intended to file a probation violation and agent warrant for Dalley's arrest. *Id* ¶ 3. Based on that information, Idaho State Police conducted surveillance on Dalley as he drove to various locations around Pocatello. *Compl.* ¶ 17, Dkt. 1. Dalley was alone and driving a gold-colored Chevrolet Blazer during his visits to these locations. *Def. SOF* ¶ 7.

The vehicle's registered owner was Casey Casper. *Pl. SOF* ¶ 6, Dkt. 52-1. Casper agreed to allow Moreno to use and take care of the vehicle "as if it were her own" until Mr. Casper was released from jail. *Casper Aff.* Dkt. 43-2. Moreno, in turn, had allowed Dalley to use the Blazer to run errands on August 21. The Officers were aware that Casper was the Blazer's registered owner and that Ashlyn Moreno had previously driven the vehicle. *Pl. SOF* ¶¶ 2, 6.

On August 21, 2013, while the vehicle was parked in a grocery store parking lot, and without a warrant, Officer Olsen installed a GPS tracking device on the Blazer. *Pl.*

*SOF* ¶¶ 1, 10, 12. On August 22, 2013, Officers Blackhawk, Olsen, Edgely and Kempf used the GPS tracking device to locate the Blazer on the public streets. *Pl. SOF* ¶ 13. Dalley was driving the Blazer and Moreno was a passenger at that time. *Def. SOF* ¶ 15. A traffic stop was attempted, but Dalley did not stop the vehicle. *Id.* ¶ 16. Officers thereafter used the GPS tracking device to relocate the Blazer on Maryzelle Lane in Pocatello. *Pl. SOF* ¶ 17.

Detective Blackhawk was first to arrive at the location of the stopped Blazer. *Id.* ¶ 18. Olsen followed closely behind. *Id.* Dalley had fled the scene by the time Blackhawk arrived but Moreno remained in the vehicle. *Id.* ¶¶ 19, 20.  Upon arriving, Detective Olsen drew his weapon and ordered Ashlyn to exit the car with her hands up, and she complied. *Id.* ¶¶ 21. Ashlyn was handcuffed and ordered to kneel on the concrete driveway on which they were standing. *Id.* ¶ 22.

Olsen and Kempf questioned Moreno while she knelt on the ground in handcuffs, seeking information about Dalley's whereabouts. *Id.* ¶ 23; *Blackhawk Dec.*, ¶¶ 25–28, Dkt. 29-3. Moreno was not informed of her Miranda rights during this questioning. *Pl. SOF* ¶ 24.  Ashlyn remained kneeling in handcuffs on concrete for 25 to 45 minutes while additional officers, including Lieutenant John Kempf, a supervisory officer, searched the surrounding neighborhood looking for Ryan Dalley. *Id.* ¶ 26.  When Kempf returned from the search, he ordered Blackhawk and Olsen to arrest Moreno for resisting and obstructing. *Id.* ¶ 28.  They did so. *Id.*

2.      **Litigation Background**

Plaintiff filed this action under both 42 U.S.C. § 1983 and state law, alleging the following constitutional deprivations: (1) unlawful search, through the warrantless installation and use of the GPS tracking device; (2) coercive questioning and compelled self-incrimination; (3) unlawful arrest; (4) excessive force; and (5) failure to train and supervise. Plaintiff brought additional claims against Defendant Blackhawk, not at issue here, for a violation of her right to bodily integrity.

Defendants State of Idaho, Idaho State Police, Olsen, and Kempf filed an early motion for summary judgment seeking a ruling that they have qualified immunity from the unlawful search claim. Dkt. 25. They later filed a second motion for summary judgment encompassing all but Counts V and VI – in those counts, only Blackhawk is a named defendant. Dkt. 42. Specifically, these defendants argue that (1) Plaintiff has failed to establish the above-mentioned constitutional violations; (2) that the officers are entitled to qualified immunity on all § 1983 claims; and (3) that all claims against the State of Idaho, Idaho State Police, and Officer Defendants, in their official capacities, are barred by sovereign immunity. Plaintiff then filed a cross motion for summary judgment on the unlawful search claim. Dkt. 43.

## LEGAL STANDARD

1.      **Motion for Summary Judgment.**

Summary judgment is appropriate where a party can show that, as to any claim or defense, "there is no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law." Fed. R. Civ. P. 56(a).  One of the principal purposes of the

summary judgment "is to isolate and dispose of factually unsupported claims . . . ."

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).  It is "not a disfavored procedural

shortcut," but is instead the "principal tool[ ] by which factually insufficient claims or

defenses [can] be isolated and prevented from going to trial with the attendant

unwarranted consumption of public and private resources."  *Id*. at 327.  "[T]he mere

existence of some alleged factual dispute between the parties will not defeat an otherwise

properly supported motion for summary judgment."  *Anderson v. Liberty Lobby, Inc*., 477

U.S. 242, 247-48 (1986).  There must be a genuine dispute as to any *material* fact – a fact

"that may affect the outcome of the case."  *Id.* at 248.

The evidence must be viewed in the light most favorable to the non-moving party,

and the Court must not make credibility findings.  *Id.* at 255.  Direct testimony of the

non-movant must be believed, however implausible.  *Leslie v. Grupo ICA*, 198 F.3d

1152, 1159 (9th Cir. 1999).  On the other hand, the Court is not required to adopt

unreasonable inferences from circumstantial evidence.  *McLaughlin v. Liu*, 849 F.2d

1205, 1208 (9th Cir. 1988).

The moving party bears the initial burden of demonstrating the absence of a

genuine dispute as to material fact.  *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir.

2001) (en banc).  To carry this burden, the moving party need not introduce any

affirmative evidence (such as affidavits or deposition excerpts) but may simply point out

the absence of evidence to support the nonmoving party's case.  *Fairbank v. Wunderman*

*Cato Johnson,* 212 F.3d 528, 532 (9th Cir.2000).

This shifts the burden to the non-moving party to produce evidence sufficient to support a jury verdict in her favor. *Deveraux*, 263 F.3d at 1076. The non-moving party must go beyond the pleadings and show "by her [ ] affidavits, or by the depositions, answers to interrogatories, or admissions on file" that a genuine dispute of material fact exists. *Celotex,* 477 U.S. at 324.

## 2.     Qualified Immunity

The doctrine of qualified immunity "protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Qualified immunity gives government officials "breathing room to make reasonable but mistaken judgments about open legal questions. When properly applied, it protects all but the plainly incompetent or those who knowingly violate the law." *Ashcroft v. al–Kidd*, 563 U.S. 731, 743 (2011).

In determining whether an officer is entitled to qualified immunity on summary judgment, the Court must determine whether the facts alleged, taken in the light most favorable to the plaintiff, "(1) . . . show that the officer's conduct violated a constitutional right, and (2) the right at issue was clearly established at the time of the incident such that a reasonable officer would have understood his or her conduct to be unlawful in that situation." *Torres v. City of Madera*, 648 F.3d 1119, 1123 (9th Cir. 2011). If there is a material dispute as to the "facts and circumstances within an officer's knowledge," or

"what the officer and claimant did or failed to do," summary judgment is inappropriate. *Act Up!/Portland v. Bagley*, 988 F.2d 868, 873 (9th Cir. 1993).

To determine whether the right was clearly established, the Court turns to Supreme Court and Ninth Circuit law existing at the time of the alleged acts. *See Osolinski v. Kane*, 92 F.3d 934, 936 (9th Cir. 1996). In the absence of binding precedent, the district court should look to available decisions of other circuits and district courts to ascertain whether the law is clearly established. *See id.*

The inquiry of whether a right was clearly established "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Saucier*, 533 U.S. at 201. "The relevant, dispositive inquiry is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001) (*citing Wilson v. Layne*, 526 U.S. 603, 615 (1999)). "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, . . . [but] in the light of pre-existing law the unlawfulness must be apparent." *Creighton*, 483 U.S. at 640, 107 S.Ct. 3034 (internal citations omitted). "[E]xisting precedent must have placed the statutory or constitutional question beyond debate." *Mullenix v. Luna*, 136 S.Ct. 305, 308 (2015) (citing *Ashcroft v. al–Kidd*, 563 U.S. at 741).

## ANALYSIS

### 1.    Claims Against State of Idaho, ISP, and Officers in their Official Capacity

Defendants correctly argue that all claims against Defendants State of Idaho, Idaho

State Police, and the officers in their official capacity are barred by the Eleventh Amendment to the United States Constitution and by the statutory bounds of § 1983. *Def. Mot.* at 5–7, Dkt. 42. A state, its agencies, and its actors in their official capacities are not "persons" who may be sued under 42 U.S.C. § 1983. *Will v. Michigan Dep't of State Police*, 491 U.S. 58 (1989).[1] Furthermore, Eleventh Amendment sovereign immunity bars private § 1983 and state law damages claims[2] against these entities in federal court without their consent. *Lee v. Murphy*, 844 F.2d 628, 631 (9th Cir. 1988). Plaintiff concedes that these claims "can be properly dismissed on summary judgment." *Pl. Resp.* at 4, Dkt. 52.

Accordingly, the Court will award summary judgment in favor of Defendants as to all claims against the State of Idaho, ISP, and officers in their official capacity—both under state law and § 1983. This leaves only the claims brought against Officers Kempf, Olsen, and Blackhawk (collectively, "defendant officers") in their personal capacity.

## 2.   Count 1 - Unreasonable Search (§ 1983)

Plaintiff's alleges that the warrantless placement and subsequent use of the GPS tracking device constituted an unlawful search under the Fourth Amendment, in light of the Supreme Court's decision in *United States v. Jones*, 565 U.S. 400 (2012). The

---

[1] Plaintiff incorrectly asserts that the § 1983 claims would have "clearly survive[d]" had this case been removed from state court. *Pl. Resp.* at 4, Dkt. 52. A § 1983 damages action can never proceed against a state, its agencies, or its actors in their official capacity—even if a state's sovereign immunity has been waived by removal to federal court—because those entities are not deemed "persons" under the statute. *Will v. Michigan Department of State Police*, 491 U.S. 58 (1989).

[2] Plaintiff seeks only damages remedies. *Amended Compl.* at 18, Dkt. 57.

defendant officers argue that Moreno lacks standing to challenge the search and that the officers are nonetheless entitled to qualified immunity. Plaintiff filed a cross-motion for summary judgment on this claim.

**A.**     ***Whether a Fourth Amendment Search Occurred***

The Fourth Amendment protects the rights of the people "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const., amend. IV. Warrantless searches "are *per se* unreasonable under the Fourth Amendment-subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357. A "search" for purposes of the Fourth Amendment occurs either when the government intrudes upon a person's "reasonable expectation of privacy," *Katz v. United States*, 389 U.S. 347, 361 (1967) (Harlan, J., concurring), or when the government intrudes upon a "constitutionally protected area" for the purpose of acquiring evidence. *See United States v. Jones*, 565 U.S. 400, 408 n.5 (2012); *Florida v. Jardines*, 133 S. Ct. 1409, 1414 (2013).

To claim Fourth Amendment protection, an individual must demonstrate that she personally has a connection to the place or thing being searched.[3] Under the *Katz*

---

[3] The parties refer to this as an issue of "standing." This is a misnomer. The Supreme Court did away with the concept of "standing" in the Fourth Amendment context nearly 40 years ago in *Rakas v. Illinois*, 439 U.S. 128 (1998). *See Minnesota v. Carter*, 525 U.S. 83, 88, (1988) (noting that the "The [court] analyzed whether respondents had a legitimate expectation of privacy under the rubric of 'standing' doctrine, an analysis this Court expressly rejected 20 years ago in *Rakas*[.]") (*citing Rakas v. Illinois*, 439 U.S. 128 (1998)); *see also United States v. Nerber*, 222 F.3d 597, 599 n. 1 (9th Cir. 2001) ("Although this issue is often discussed in terms of 'standing' . . . , the Supreme Court has repeatedly (Continued)

"privacy expectations" approach, the individual must establish a "legitimate expectation of privacy in the invaded place." *Rakas v. Illinois*, 439 U.S. 128, 143. Under the *Jones* "trespass" approach, the claimant must have "a sufficient property or possessory interest" in the property being searched. *See Lyall v. City of Los Angeles*, 807 F.3d 1178, 1196 n.9 (9th Cir. 2015).

In *United States v. Jones*, the U.S. Supreme Court applied the common-law trespass approach to hold that "the Government's installation of a GPS device on a target's vehicle, and its use of that device to monitor the vehicle's movements, constitutes a 'search'" within the meaning of the Fourth Amendment. 565 U.S. at 404. Here, the defendant officers installed a GPS device on the Blazer and used it to gather information about the vehicle's whereabouts, in a manner nearly indistinguishable from the facts in *Jones*. The officers acted without a warrant and do not argue that the GPS tracking was exempt from the general warrant requirement. There is no question, therefore, that the warrantless installation of a GPS device on the Blazer here constituted an unreasonable search under the Fourth Amendment.

That does not end the inquiry, however. To claim protection of the Fourth Amendment under the *Jones* decision, Moreno must establish that she personally had a sufficient property or possessory interest in the Blazer. In *Jones* itself, the defendant did

---

cautioned against invoking this concept."). Accordingly, the parties' arguments on "standing" are subsumed into the substantive Fourth Amendment question of whether Moreno's personal rights were violated.

not own the vehicle in question but "had at least the property rights of a bailee," an interest which the Court deemed sufficient. *United States v. Jones*, 565 U.S. 400, 404 n.2 (2012).  At least with respect to automobiles, therefore, *Jones* establishes that a bailee has a sufficient interest to bring a trespass-based Fourth Amendment challenge.

Here, as in *Jones*, Moreno claims that she was a bailee of the searched vehicle. The basic elements of a bailment are "(1) the delivery of personal property from one person to another for a specific purpose, (2) the acceptance by the transferee of such delivery, (3) an express or implied agreement that the purpose will be fulfilled, and (4) an understanding that the property will be returned to the transferor or dealt with as the transferor directs." *State v. Johnson*, 326 P.3d 361, 364 (Idaho Ct. App. 2014). Construing all facts in the light most favorable to Moreno, as we must, there is sufficient evidence to conclude that the Blazer was (1) delivered to Moreno by the bailor, Casey Casper; (2) Moreno accepted delivery; (3) there was an agreement between Moreno and Casper that the purpose for Moreno having the vehicle was for her to use and take care of the car as if it were her own until Mr. Casper was released from jail; (4) the understanding was that Moreno would return, or Casper would retrieve, the Blazer upon his release. Accordingly, the court concludes that Moreno has produced sufficient evidence of a property interest in the Blazer—that of bailee.

Defendant argues that Plaintiff cannot demonstrate that the government trespassed against her when it placed the GPS device on the Blazer, because the officers installed the GPS tracker on a day when Moreno had loaned the car to Dalley. The Court disagrees.

There is no evidence that Casper knew of or authorized Dalley's use of the vehicle. The Court must therefore conclude for purposes of summary judgment that Dalley assumed nothing more than the rights as a gratuitous sub-bailee of the Blazer, making Moreno a sub-bailor. This sub-bailment would not extinguish Moreno's rights and obligations under the original bailment with Casey—including the common law right to sue for a trespass occurring during the term of her bailment and, presumably, a derivative trespass-based Fourth Amendment search claim. *See* 8A Am. Jur. 2d Bailments § 125; 8A Am. Jur. 2d Bailment § 166, pp. 685–686 (2009).

Moreno had additional rights as sub-bailor to Dalley. Under common law, gratuitous bailors are deemed to retain "constructive possession"[4] of chattel held by the bailee, in the sense that they have an immediate right to retake actual possession.[5] As a gratuitous sub-bailor to Dalley, therefore, Moreno retained constructive possession of the

---

[4] "Constructive possession is a legal fiction, and exists when there is no actual possession, but there is title granting an immediate right to actual possession; the key test is whether there is a right to present possession whenever desired, or a right to immediate actual possession." 75 Am. Jur. 2d Trespass § 14.

[5] *See, e.g.*, *Muggridge v. Eveleth*, 50 Mass. 233, 235 (1845) ("[T]o enable a party to maintain trespass . . . , he must be in the actual possession of the property taken, or . . . have such an immediate right to possession as will be deemed, in law, constructive possession."; *Overby v. McGee*, 15 Ark. 459, 464 (1855) ("But where the general owner merely permits another gratuitously to use his chattel, such owner may maintain trespass against a stranger for an injury done to it, whilst thus held."); *Butler v. Collins*, 12 Cal. 457 (1859) ("[I]t has been said that the general owner holds the constructive possession of personal property, and this is sufficient to maintain trespass, though actual possession be in another."); *Walker v. Wilkinson*, 35 Ala. 725 (1860) (A gratuitous bailor, with the immediate right of repossession, may maintain trespass while chattel was in possession of bailee.); *N.Y., L. E. & W. R. Co. v. New Jersey Elec. Ry. Co.*, 60 N.J.L. 338, 343, 38 A. 828, 830 (N.J. Sup. Ct. 1897), aff'd, 61 N.J.L. 287, 41 A. 1116 (N.J. 1897) ("[U]nder general principles, a bailor can maintain an action for injury to the property bailed, . . . especially wherever the injury is of a permanent character."); *Cooperider v. Myre*, 175 N.E. 235, 236 (Ct. App. 1930) ("The mere fact of one putting property into the charge or custody of another does not divest the possession of the true owner; the legal possession still remains in the owner.").

Blazer at the moment of the trespass. Constructive possession is sufficient under common law to support a trespass action. *See* 75 Am. Jur. 2d Trespass § 14. Furthermore, as evidenced by *Jones*, an individual need not be in *actual* possession of the vehicle at the time that the trespass occurs, so long as she has a possessory interest at the time of the search. In *Jones,* agents installed the GPS tracking device on the undercarriage of the Jeep while it was parked in a public lot, out of Jones' actual possession.

Thus, construing the facts in the light most favorable to Plaintiff, the Court concludes that Moreno held the requisite possessory interest in the Blazer—as bailee and sub-bailor—at the moment of trespass. Furthermore, the trespass was conjoined with the subsequent use of the GPS tracker to monitor the Blazer's location while Moreno was a passenger of the vehicle. Accordingly, the Court concludes that Moreno has established a material dispute of fact as to whether the challenged GPS search violated her Fourth Amendment rights.

### B.    *Whether the Right Was Clearly Established*

Having established that the defendant officers violated Moreno's Fourth Amendment rights when they conducted the warrantless GPS search of the Blazer, the Court must evaluate whether that right was clearly established at the time of the incident.

Without question, the "clearly established federal law" which the officers were bound to follow included the *Jones* decision, which was issued over a year before the events at issue here. At the time of the challenged search, therefore, the Supreme Court had clearly established that the "the Government's installation of a GPS device on a

target's vehicle, and its use of that device to monitor the vehicle's movements, constitutes a 'search'" within the meaning of the Fourth Amendment. *Jones*, 565 U.S. at 404.

Furthermore, the operative facts in *Jones* closely mirror those present here. This case, as *Jones*, involves the: (1) physical installation of a GPS tracker; (2) on a vehicle; (3) while the vehicle is parked in a public place; and (4) subsequent use of that device; (5) to monitor the movements of the vehicle's bailee. The key facts distinguishing *Jones* from the present case are (1) that the officers committed a trespass in installing the GPS tracker, (2) that the installation occurred, however, on a day when the vehicle was in the possession of a third party, and (3) that Moreno was not the exclusive user of the vehicle.

The issue of qualified immunity therefore boils down to the following question: was Moreno's property interest in the Blazer sufficiently distinguishable from that presented in *Jones* such that a reasonable officer could mistakenly conclude that the GPS tracker's installation would not violate her Fourth Amendment rights? With some reservation, the Court feels compelled to answer that question in the affirmative.

Under *Jones*, a challenger's property or possessory interest in a vehicle determines her ability to bring a trespass-based Fourth Amendment claim. *El–Nahal v. Yassky*, 835 F.3d 248, 256–57 (2d Cir. 2016) ("[T]o claim that the Government trespassed or physically intruded upon one's constitutionally protected area for the purposes of gathering information, a plaintiff must establish a property interest in a constitutionally protected area at the time of the intrusion."). Consistent with this understanding, lower courts have reached varying conclusions when facing property interests of a different

nature than the exclusive bailment present in *Jones*.[6] So too could a reasonable officer have concluded that Moreno's property interest fell short of satisfying the bar established in *Jones*.

Only adding to the potential confusion was the manner in which *Jones* distinguished prior "beeper cases," including *United States v. Knotts*, 460 U.S. 276 (1983) and *United States v. Karo*, 468 U.S. 705 (1984), on the basis that the beepers had been installed before the property came into the possession of the challenger. *See Jones* 132 S.Ct. at 952 (emphasizing that Jones "possessed the Jeep at the time the Government trespassorily inserted the information-gathering device"). A reasonable officer could have concluded that Moreno's lack of actual control or possession of the Blazer during the

---

[6] *Compare United States v. Gibson*, 708 F.3d 1256, 1277 (11th Cir. 2013) (defendant who borrowed vehicle with owner's consent, drove it often, and paid for insurance and maintenance lacked sufficient "exclusive custody and control" to challenge the installation and use of GPS tracking device while he was neither the driver nor a passenger); *Commonwealth v. Arthur*, 62 A.3d 424, 430 (Pa. Super. Ct. 2013) (defendant lacked possessory interest sufficient to challenge GPS search of vehicle where she was not the owner, never drove it, and was not a passenger at the time of GPS installation); *United States v. Shephard*, 495 F. App'x 553, 558 (6th Cir. 2012) (defendant could not challenge GPS installation in co-conspirators' vehicles that he did not own or drive); *United States v. Hanna*, No. 11-20678-CR, 2012 WL 279435, at *3 (S.D. Fla. Jan. 30, 2012) (defendant could not challenge GPS search of a vehicle shared by multiple robbery co-conspirators where defendant neither held title to the vehicle nor occupied the vehicle at the time the GPS device was installed); *United States v. Johnson*, 871 F. Supp. 2d 539, 547 (W.D. La. 2012) (defendant police officer lacked interest sufficient to challenge GPS search of the police cruiser assigned to him, because he "relinquished his possessory interest when he parked the car on the department law at the end of each day"), *with State v. Mitchell*, 234 Ariz. 410, 323 P.3d 69 (Ct. App. 2014) (defendant had sufficient interest to challenge GPS search of a vehicle he did not own but drove sporadically, based on "continuing trespass" theory, even though he was not in possession of vehicle at time police installed GPS); *United States v. Gordon*, No. 11-cr-20752, 2013 WL 791622, at *5-6 (E.D. Mich. Mar 4, 2013) (defendant owner of vehicles used in a conspiracy could challenge the GPS search even though co-conspirators drove cars for month-long blocks); *United States v. Lopez*, 895 F.Supp.2d 592, 600–01 (D. Del. 2012) (defendant had a possessory interest sufficient to challenge GPS search of four vehicles not registered to him, where the GPS devices were installed outside his apartment, he had driven the monitored vehicles, he appeared to be the exclusive user, and there was no evidence that he was not an authorized user).

moment of trespass likened this case to *Knotts* and *Karo.*

Given the existing state of the case law, and the circumstances facing the officers, it was not "beyond debate" that the installation of a GPS tracker on the Blazer would violate Moreno's Fourth Amendment rights. A reasonable officer could have concluded that Moreno's lack of actual possession and exclusive use of the Blazer were distinctions with constitutional significance.

The evidence does support an inference that the officers believed a warrant was required for the search. However, the officers' subjective beliefs are largely irrelevant to the qualified-immunity analysis. *Ashcroft v. al-Kidd*, 563 U.S. 731, 737 (2011) ("We ask whether 'the circumstances, viewed objectively, justify [the challenged] action.' If so, that action was reasonable '*whatever* the subjective intent' motivating the relevant officials.") (internal citations omitted) (alteration in original). It does not matter if the officers thought they were violating the law so long as the law was not clearly established. Nonetheless, the Court cautions that "after *Jones,* law enforcement should carefully consider that a warrant may be required when engaging in such installation and surveillance." *United States v. Katzin*, 769 F.3d 163, 170 (3d Cir. 2014).

In sum, the Court concludes that the defendant officers are entitled to qualified immunity on Moreno's unlawful search claim. The Court will deny Plaintiff's Motion for Summary Judgment and grant Defendants' Motions for Summary Judgment (Dkts. 25, 42) as to this claim.

**3.      Count II - Unlawful Arrest (§ 1983)**

A.      *Whether a Constitutional Violation Occurred*

Moreno next alleges that she was arrested in violation of her Fourth Amendment rights. Defendants acknowledge that Moreno was placed under arrest, but argue that the arrest was supported by probable cause that Moreno committed the crime of "resisting and obstructing" in their presence. Plaintiff contends (1) that the officers lacked probable cause for the arrest and (2) that even if supported by probable cause, the arrest was tainted by the preceding unlawful traffic stop and therefore unlawful.

(1)      **Effect of Prior Events on Moreno's Arrest**

The second argument is quickly disposed of. To begin, Plaintiff appears to rely on the fruit of the poisonous tree doctrine to link the alleged unlawful stop to her subsequent arrest.[7] The fruit of the poisonous tree doctrine is an evidentiary rule used to exclude evidence obtained as a result of an unconstitutional search or seizure. It is not applicable to civil § 1983 actions. *See Townes v. City of New York*, 176 F.3d 138 (2d Cir. 1999) (concluding that the exclusionary rule and related fruit-of-the-poisonous-tree doctrine does not apply to a § 1983 civil rights action); *Orellana v. Cty. of Los Angeles*, No. CV1201944, 2013 WL 12122692, at *6 (C.D. Cal. Apr. 29, 2013), *aff'd*, 630 F. App'x 730 (9th Cir. 2016) ("It is widely acknowledged, however, that '[t]he fruit of the

---

[7] Plaintiff's brief presents no legal basis for the theory that an otherwise lawful arrest could be tainted by prior unlawful acts by the officers. However, the invocation of language characteristic of a fruits-of-the-poisonous-tree argument leads the Court to believe that she mistakenly invokes this doctrine. Plaintiff could undoubtedly have brought a separate 1983 claim challenging the vehicle stop, but she has not done so here. The legality of the vehicle stop is raised only in the context of his "unlawful arrest" claim.

poisonous tree doctrine . . . is inapplicable to civil § 1983 actions.'") (quoting *Townes*,
176 F.3d at 145). Thus, the arrest may be constitutional even if the preceding vehicle stop
was not.

Even if the fruit of the poisonous tree doctrine could link the two events, the
Blazer was not illegally stopped. A Fourth Amendment seizure occurs "only when there
is a governmental termination of freedom of movement through means intentionally
applied." *Brower v. Cty. of Inyo*, 489 U.S. 593, 597 (1989). Moreover, "there must be
*either* the application of physical force, however slight, *or*, where that is absent,
submission to an officer's 'show of authority' to restrain the subject's liberty." *California
v. Hodari D.*, 499 U.S. 621 (1991) (emphasis in original). "Attempted seizures . . . are
beyond the scope of the Fourth Amendment." *County of Sacramento v. Lewis*, 523 U.S.
833, 845 n. 7 (1998).

Here, there was no application of physical force. The pursuing officer attempted to
stop the Blazer by a show of authority—application of his flashing lights. However,
Dalley and Moreno did not submit to that show of authority but instead attempted to
elude the officer. Dalley later stopped and fled from the vehicle of his own volition after
the officers had ceased their pursuit. Accordingly, when the defendant officers confronted
Moreno at the stopped vehicle, there had been no seizure. *See Brower v. Inyo County,*
489 U.S. 593, 596 (1989) (holding no seizure where officer signals driver to pull over but
driver speeds off).

**(2)    Probable Cause to Arrest Moreno**

Moreno's unlawful arrest claim therefore turns on whether the officers had probable cause for her arrest. "When officers have probable cause to believe that a person has committed a crime in their presence, the Fourth Amendment permits them to make [a warrantless] arrest." *Virginia v. Moore*, 553 U.S. 164, 178 (2008). Probable cause "exists when officers have knowledge or reasonably trustworthy information sufficient to lead a person of reasonable caution to believe that an offense has been or is being committed by the person being arrested." *United States v. Lopez*, 482 F.3d 1067, 1072 (9th Cir. 2007). The inquiry depends "on the totality of facts" available to the officers. *Id.* at 1073 (internal quotation marks omitted).

Here, the defendant officers assert that they had probable cause to believe that Moreno committed the crime of resisting and obstructing officers. Idaho Code § 18-705 defines the crime of resisting and obstructing as "willfully resist[ing], delay[ing], or obstruct[ing] any public officer, in the discharge, or attempt to discharge, of any duty of his office[.]" The offense of requires proof of three elements: (1) willful resistance, delay, or obstruction of an officer's duties; (2) where defendant knew that the person was an officer, and (3) the defendant also knew at the time of the resistance that the officer was attempting to perform an official act or duty. *State v. Adams*, 67 P.3d 103, 108 (Idaho Ct. App. 2003).

Here, it is undisputed that Moreno knew she was speaking with officers attempting to perform official acts or duties. However, the parties dispute what happened during Moreno's interaction with the officers and whether her acts constituted "willful

resistance, delay, or obstruction." I.C. § 18–705. The defendant officers rely on the

following justifications for Moreno's arrest: (1) that she denied that she or Dalley had

been in the Blazer, *Kempf Dep.,* 63:5–8; (2) that she refused to comply with an order to

get on the ground, *Olsen Dep.* 31:4–23; (3) that she refused to tell the officers where

Dalley went, *Olsen Dep.* 35:21–36:14; and (4) that she was generally "uncooperative,"

*Kempf Dep.* 62:8–10. There is a dispute as to whether Moreno was actually untruthful

and noncompliant with officer commands, or whether she merely refused to admit

involvement or provide information about Dalley's whereabouts. *See, e.g.*, *Blackhawk*

*Dep.* 40:3–40:15, Dkt. 42-2; *see also Pl. Mem.* at 18, Dkt. 52 (pointing out

inconsistencies in the officer testimony); *Kempf. Dep.* 78:13 – 25, 61:20–21; *Olsen Dep.*

31:19–23. Moreno denies resisting or obstructing. *Compl.* ¶¶ 45, 46, 51.

A rational jury could conclude that the officers lacked probable cause that Moreno

was engaged in willful resistance, delay, or obstruction. First, even if the officers'

testimony about Moreno's false statements is to be believed, an unsworn false statement

to officers does not ordinarily constitute obstruction within the meaning of section 18-

705. *See State v. Brandstetter*, 908 P.2d 578, 581 (Idaho Ct. App. 1995) (holding that the

"making of an unsworn false oral statement to the police was not an obstruction of an

officer within the meaning of I.C. § 18-705" where his "deliberate falsification was no

more obstructive than would have been his silence"); *State v. Cabrera*, No. 41510, 2015

WL 404582, at *1 (Idaho Ct. App. Jan. 29, 2015) (unpublished) (holding that

intentionally misdirecting officers did not constitute obstruction, because "[l]ike

*Brandstetter,* Cabrera had no affirmative obligation to answer the deputy's questions, and thus he did not increase the deputy's burden. . . . Cabrera had no obligation to short-circuit the deputy's time and effort."). Here, as in *Brandstetter* and *Cabrera*, there is no evidence that Moreno increased the burden of the officers in their search for Dalley. The officers knew, from their GPS tracker, that Dalley had been inside the vehicle, and Moreno did not misdirect their search for Dalley in the neighborhood. Even if believed, therefore, the officer testimony about Moreno's false statements would be insufficient to justify her arrest.

Second, an individual's refusal to answer an officer's questions, or volunteer helpful information, cannot be the basis of a charge of obstruction under I.C. § 18-705. *See State v. Brandstetter*, 908 P.2d 578, 581 (Idaho Ct. App. 1995) (holding that an individual has no "affirmative obligation to answer" questions posed by an officer during the course of an investigation). This is consistent with the Supreme Court's repeated pronouncements that individuals have a right not to respond to officer questions during a *Terry* stop. *See Berkemer v. McCarty*, 468 U.S. 420, 439 (1984) (holding that during a Terry stop, "the officer may ask the detainee a moderate number of questions . . . [b]ut the detainee is not obliged to respond."); *Terry v. Ohio*, 392 U.S. 1, 34 (1968) (White, J., concurring) (observing that a "person stopped is not obliged to answer, answers may not

be compelled, and refusal to answer furnishes no basis for an arrest").[8]

Finally, if Moreno's account is believed, she complied with, or only momentarily refused to comply with, the officers' commands to get on the ground. These actions would alone be insufficient for her arrest. *See, e.g.*, *Mackinney v. Nielson*, 69 F.3d 1002 (9th Cir. 1995) (holding that an individual's temporary refusal to comply with an officer's commands is insufficient to support an arrest for obstruction).[9]

In sum, a genuine issue of fact therefore remains as to whether the officers had probable cause to arrest Moreno for violating Section 18-705.

### (3)   Whether the arrest was otherwise justified

---

[8] In *Hiibel v. Sixth Judicial Dist. Court of Nevada, Humboldt Cty.*, 542 U.S. 177, 186 (2004), the Supreme Court concluded that "[a] state law requiring a suspect to disclose his name in the course of a valid *Terry* stop is consistent with [the] Fourth Amendment." However, *Hiibel* does not stand for the proposition that a detainee may be required to respond to further questioning. Indeed, the Supreme Court rested its decision on the narrow scope of the state "stop and identify" statute at issue, finding that "disclos[ing] a name is likely to . . . be incriminating only in unusual circumstances." *Id.* at 191. The majority and dissenting justices implied that further questioning, which would have a greater tendency to incriminate, might be inconsistent with the Fourth Amendment prohibition against unreasonable searches and seizures and the Fifth Amendment prohibition against compelled self-incrimination. In this Court's view, therefore, *Hiibel* did not depart from precedent suggesting that a detainee may refuse to answer questions during a *Terry* stop.
  Furthermore, the source of the obligation in *Hiibel* was Nevada's "stop and identify" statute, which required a person detained by an officer during an investigative stop to identify himself or herself. *Id.* at 187. Idaho has no stop and identify law. Idaho Courts interpreting the scope of I.C. § 18-705 have implied that the statute imposes no affirmative obligation to answer questions posed by an officer during the course of an investigation. *State v. Brandstetter*, 908 P.2d 578, 581 (Idaho Ct. App. 1995) ("Because Brandstetter could have remained silent when questioned by the law enforcement officials, his unsworn oral misstatement cannot be said to have increased the officers' burden[.]")
  [9] The statute, at issue there, California Penal Code section 148, was almost identical to Idaho Code section 18-705. Section 148 provides that: "Every person who willfully resists, delays, or obstructs any public officer . . . in the discharge or attempt to discharge any duty of his or her office or employment" is criminally punishable.
(Continued)

Defendants argue that even if the officers lacked probable cause, the unlawful arrest claim must fail because Moreno "was properly detained for officer safety."  To be sure, an initial handcuff detention may be justified on less than probable cause, where necessary to control the scene or protect the officer's safety. *United States v. Taylor*, 716 F.2d 701, 709 (9th Cir. 1983). However, it is uncontested that Moreno was formally arrested at some point during the encounter.[10] While concerns for officer safety may have justified the initial detention, they were insufficient to execute a valid warrantless arrest under the Fourth Amendment.

Defendants also argue that the lack of probable cause during the time of the initial arrest was of no consequence because the officers later obtained probable cause to arrest her on drug charges. This argument is entirely without merit. The existence of probable cause must be evaluated at the time at which the arrest was made.  *See Rosenbaum v. Washoe County,* 663 F.3d 1071, 1076 (9th Cir. 2011) (noting that the facts relevant to probable cause "are those that were known to the officer at the time of the arrest."). The officers searched the Blazer and obtained evidence to arrest Moreno on drug charges only

---

[10] *See Pl. Reply* at 10, Dkt. 58 ("It is also undisputed that Plaintiff was subsequently arrested for both resisting and obstructing police officers[.]"). Even if contested, the evidence on this point is overwhelming. *See, e.g.*, *Kempf. Dep.* 61:9–61:12, Dkt. 42-2 ("She was arrested for obstruct and delay. . . . I don't think it's appropriate to speculate any further about how we're going to go into a detention, because that didn't happen. She was arrested."); *Olsen Dep.* 27:7–27:8. ("I believe I made the call that she should be arrested for obstruction.").
(Continued)

*after* she was arrested for resisting and obstructing.[11] Their probable cause cannot

logically be based on evidence obtained after Moreno's arrest.

### B.     *Whether the Right Was Clearly Established*

The only remaining issue, then, is whether the officers are entitled to qualified

immunity.[12] At the time of Moreno's arrest, it was clearly established that an officer must

have probable cause to execute a warrantless arrest. *See Michigan v. Summers*, 452 U.S.

692, 699–700, (1981). However, qualified immunity turns on a more specific inquiry:

"whether a reasonable officer could have believed probable cause existed" for the arrest,

under the circumstances presented. *Hunter v. Bryant*, 502 U.S. 224, 228 (1991).

Because of the factual disputes as to Moreno's conduct, the Court cannot conclude

on summary judgment that the officers are entitled to qualified immunity. *See Wilkins v.*

*City of Oakland*, 350 F.3d 949, 956 (9th Cir. 2003) (holding that "[w]here the officers'

entitlement to qualified immunity depends on the resolution of disputed issues of fact in

their favor, and against the non-moving party, summary judgment is not appropriate"). If

---

[11] The officers confronted Moreno at approximately 4:27 p.m. The police report indicates that the vehicle search which produced the drug evidence did not occur until approximately 5:35, after officers had already taken Moreno into custody for the Resist and Obstructing charge. *See Incident Report* at 10, Dkt. 58-1.

[12] Defendants object generally to Plaintiff's failure to discuss the issue of qualified immunity for all but Count I. The lack of any real argument that the rights here were "clearly established," and failure to present the court with relevant precedent, was a surprising oversight. However, the Supreme Court in *Elder v. Holloway*, 510 U.S. 510, 516 (1994), rejected the notion that a plaintiff must come forward with "legal facts" to prove that the law is clearly established so as to withstand an assertion of qualified immunity. Whether a right is clearly established is a question of law for the court, to be decided on the basis of all relevant authority, not simply the cases cited by the plaintiff. The Court must use its "full knowledge of its own [and other relevant] precedents." *Id.* (citing *Davis v. Scherer*, 648 U.S. 183, 192, n.9 (1984). Accordingly, Plaintiff's failure to present relevant case law does not establish the absence of a genuine issue of material fact as to the officers' entitlement to qualified immunity.

Moreno's account is believed, she merely lied or refused to assist the officers in locating Dalley. No reasonable officer could have believed that this conduct alone provided probable cause to arrest for resisting and obstructing under Idaho Code Section 18-705. Accordingly, questions of fact preclude a finding that the defendant officers are entitled to a qualified immunity defense as a matter of law.

**4.      Count III - Compelled Self-Incrimination / Coercive Interrogation (§ 1983)**

      **A.      *Fifth Amendment Compelled Self-Incrimination***

Moreno asserts in Count III that the defendant officers violated her Fifth Amendment rights because she was not provided with *Miranda* warnings before being subjected to "custodial interrogation,"[13] when detained in handcuffs and questioned. Defendants argue that Moreno does not state a claim under the Fifth Amendment because her statements were not incriminating and were never used in a criminal proceeding.

The Fifth Amendment provides that "no person [shall] be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. In *Chavez*, the Supreme Court held that mere coercion does not create a cause of action under § 1983 for a violation of the Self-Incrimination clause, absent "use" of the compelled statement in a criminal case. *Chavez v. Martinez*, 538 U.S. 760 (2003). The Court did not decide the precise moment at which a "criminal case" commences, but opined that it requires, "at the very least[,] . . . the initiation of legal proceedings." *Id.* Recently, the Ninth Circuit

---

      [13] The Court assumes, without holding, that the roadside questioning of Moreno constitutes "custodial interrogation," such that she was entitled to *Miranda* warnings.

clarified that "[a] coerced statement has been 'used' in a criminal case when it has been relied upon to file formal charges against the declarant, to determine judicially that the prosecution may proceed, and to determine pretrial custody status." *Stoot v. City of Everett*, 582 F.3d 910, 925–26.

Here, Moreno fails to allege that the statements were used in any criminal proceeding against her. While she was arrested for resisting and obstructing, there is no evidence that formal charges were ever brought for this offense.[14] Furthermore, although Moreno was questioned by the police, she did not make "incriminating statements" within the meaning of the Fifth Amendment. Moreno alleges that her statements were incriminating in that they allowed the officers to charge her with resisting or obstructing. However, her statements did not implicate her in any independent wrongdoing but were deemed a crime in and of themselves.

Accordingly, summary judgment will be granted on this claim.

**B.    *Fourteenth Amendment Coercive Interrogation***

Moreno also alleges that the defendant officers violated her Fourteenth Amendment substantive due process right to be free from coercive questioning. The standard for showing a Fourteenth Amendment substantive due process violation for coercive interrogation is quite demanding. The claimant must show (1) bad police action that "shocks the conscience" and "violates the decencies of civilized conduct"; *County of*

---

[14] It appears that the U.S. Attorney's Office eventually initiated federal drug charges; Moreno does not allege that charges were brought for resisting and obstructing. *Compl.* ¶ 113.

*Sacramento v. Lewis*, 523 U.S. 833, 846 (1998); and (2) that statements were obtained as a result of overbearing the will of the accused. *Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973).

Plaintiff hasn't established the basic elements of this claim. Even assuming the "shocks the conscience" element is met, she has not alleged or established any evidence that she made a confession, let alone that such a confession resulted from her will being overborne. Accordingly, summary judgment will be granted on this claim.

**5.      Count IV – Excessive Force (§ 1983)**

Plaintiff brings a claim under 42 U.S.C. § 1983 alleging that the officers used excessive force in requiring Moreno to remain handcuffed, kneeling on a concrete driveway 45 minutes.[15] *Pl. SOF* ¶ 26. Plaintiff argues that this use of force was in retaliation for Moreno's failure to assist the officers. *Id.* In response, the officers maintain that their force was not excessive and, in any event, that they are entitled to qualified immunity.

**A.      *Whether Excessive Force Was Used***

Fourth Amendment claims of excessive force are evaluated according to the framework established by *Graham v. Connor*, 490 U.S. 386 (1989). Under *Graham*, "[d]etermining whether the force used to effect a particular seizure is reasonable under

---

[15] There is some dispute about the length of time for which Moreno was forced to kneel in handcuffs. Plaintiff's statement of facts places the outward estimate at 45 minutes. For purposes of summary judgment, the Court uses this figure.

the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." 490 U.S. at 396 (internal quotation marks and citations omitted).  The government's interests are evaluated by looking at a range of factors, including: "[1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether [s]he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. Courts may also consider the availability of other alternatives. *See Davis v. City of Las Vegas*, 478 F.3d 1048, 1054 (9th Cir. 2007). However, officers need not use the least intrusive means available to them. *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994).

Reasonableness "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396; *Wilkinson*, 610 F.3d at 550. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396–97; *Wilkinson*, 610 F.3d at 550.

Here, the nature and quality of the intrusion was less significant than most claims of force. The Court does not wish to diminish the pain which can result from prolonged kneeling on a hard, concrete service. Indeed, forcing an individual to stand or kneel for an extended period is a recognized interrogation technique. *See Iqbal v. Dep't of Justice*, No.

3:11-CV-369-J-37JBT, 2014 WL 169867, at *5 (M.D. Fla. Jan. 15, 2014) (unreported).
However, the police here did not deliver physical blows, apply a taser or other service
weapon, or cause any alleged injuries. This mitigates against a finding of excessive force
but is not dispositive. *Wilks v. Reyes,* 5 F.3d 412 (9th Cir. 1993) (holding that the
quantum of force is a relevant factor but rejecting the Fifth Circuit's requirement that a
plaintiff show "significant injury" to establish an excessive force claim under the Fourth
Amendment).

The remaining *Graham* factors weigh heavily in Moreno's favor. She was
suspected of committing only a minor crime—resisting and obstructing.[16] If Moreno's
account is to be believed, she complied with all of the officer's commands. There is no
suggestion that Moreno was combative or physically resisted the officers. She was far
outnumbered by the officers on the scene. Finally, while the officers had an objectively
reasonable concern for their own personal safety as they first encountered Moreno at the
vehicle, given that they were unsure of Dalley's whereabouts, *Olsen Dep.* at 26-27, that
concern for their personal safety diminished as the encounter developed further and they
secured the scene. There is no suggestion that Moreno herself posed a danger to the
officers or bystanders. *See Olsen Dep.* ("I didn't view Ashlyn as a threat.").

In this case, the *Graham* balancing test comes out in favor of Moreno. Assuming

---

[16] The Court's conclusion that the officers lacked probable cause to arrest Moreno for resisting and arresting does not make the application of any force constitutionally unreasonable. *See Headwaters Forest Def. v. County of Humboldt*, 240 F.3d 1185, 1204 (9th Cir. 2000).

events transpired as Moreno alleges, a reasonable jury could conclude that it was unreasonable to have Moreno kneel while restrained in handcuffs for such an extended period of time. Handcuffing itself may support a claim of excessive force, if the suspect poses no physical threat to officer safety or if the manner of handcuffing is itself excessive. *See Estrada*, 632 F.3d at 1078 (affirming denial of qualified immunity to officer who handcuffed an individual posing no safety threat); *Meredith v. Erath*, 342 F.3d 1057, 1059 (9th Cir. 2003) (affirming denial of qualified immunity to IRS agent who handcuffed a passively resistant resident during search for evidence of income tax violations.); *Dillman v. Tuolumne Cnty.*, No. 13–cv–404–LJO–SKO, 2013 WL 1907379, at *8 (E.D.Cal. May 7, 2013) (collecting Ninth Circuit cases suggesting that handcuffing can constitute excessive force "where a plaintiff claims to have been demonstrably injured by the handcuffs or where complaints about the handcuffs being too tight were ignored."). Here, a reasonable jury could conclude that leaving Moreno in handcuffs after it was clear she posed no physical threat was excessive force.

More likely to be deemed excessive is the decision to force Moreno to kneel for 45 minutes on hard concrete. Officers "are not required to use the least intrusive degree of force possible," and "[w]hether officers hypothetically could have used less painful, less injurious, or more effective force in executing an arrest is simply not the issue." *Forrester v. City of San Diego*, 25 F.3d 804, 807–08 (9th Cir. 1994). However, the "the existence of less forceful options to achieve the governmental purpose is relevant." *Marquez v. City of Phoenix*, 693 F.3d 1167, 1174 (9th Cir. 2012), *as amended on denial of reh'g* (Oct. 4,

2012); *see also Davis v. City of Las Vegas*, 478 F.3d 1048, 1056 (9th Cir. 2007) (holding that the force used was unreasonable, in part because there "were many less abusive means through which [the officer] could have accomplished his objective."). Here, the availability of a less painful and humiliating alternative here—merely placing Moreno in the back of a patrol vehicle—weighs against a finding of reasonableness.

Moreover, the use of additional force on a detainee already under control of the officers may be considered excessive. *See, e.g.*, *Guy v. City of San Diego*, 608 F.3d 582, 589 (9th Cir. 2010) ("[I]f the officers go too far by unnecessarily inflicting force and pain after a person is subdued, then the force, unnecessary in part of the action, can still be considered excessive."); *LaLonde v. County of Riverside,* 204 F.3d 947, 961 (9th Cir. 2000) (holding that unnecessarily prolonged exposure to pepper spray constituted excessive force); *Headwaters Forest Def. v. County of Humboldt*, 276 F.3d 1125, 1130 (9th Cir. 2002) ("Because the officers had control over the protesters[,] it would have been clear to any reasonable officer that it was unnecessary to use pepper spray to bring them under control[.]"). Here, Moreno was already under control by her voluntary cooperation, by physical restraint by handcuffs, and by being physically outnumbered by watchful officers on the scene.

Finally, "[t]o be reasonable, force has to be designed to accomplish a legitimate objective." *Forrester v. City of San Diego*, 25 F.3d 804, 813 (9th Cir. 1994) (J. Kleinfeld, dissenting); *Blankenhorn v. City of Orange*, 485 F.3d 463, 480 (9th Cir. 2007) ("force is only justified when there is a need for force.") The defendant officers make no attempt to

connect the decision to leave Plaintiff kneeling on the concrete with a legitimate law enforcement need or objective. Presumably, ordering a detainee to kneel would limit the person's ability to fight or flee. However, the facts construed in Plaintiff's favor do not suggest that Moreno posed a flight or safety risk. She was compliant, unarmed, handcuffed, surrounded, and outnumbered by officers. *See Davis v. City of Las Vegas*, 478 F.3d 1048, 1056 (9th Cir. 2007) (finding no reasonable risk of flight or harm where suspect was confined and handcuffed). The officers also knew that Moreno was only a passenger in the Blazer when it absconded. This lack of any apparent legitimate police objective bears on the reasonableness of the force.[17]

In sum, we conclude a reasonable jury could find that the officers employed greater force than was reasonably necessary under the circumstances.

### B.  *Whether the Right Was Clearly Established*

We now turn to whether a reasonable officer would have known that the use of force here was unlawful. *Saucier*, 533 U.S. at 202. There is no precedent covering the unique circumstances present here. The Court is aware of no case in which forcing a detainee to kneel for an extensive period of time was deemed excessive. Indeed, there is a

---

[17] Moreno suggests that the officers actions were improperly motivated by their in desire to coerce Moreno's cooperation in locating Dalley, or to retaliate for her failure to cooperate. The United States Supreme Court has made clear, however, that "[t]he Fourth Amendment inquiry is one of 'objective reasonableness' under the circumstances, and subjective concepts like 'malice' and 'sadism' have no proper place in that inquiry." *Graham*, 490 U.S. at 399. "An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional." *Graham*, 490 U.S. at 398. Thus, the Court will not consider arguments about the officers' subjective motivations.

dearth of case law in which comparable forms of mild force were deemed constitutionally excessive. "Although a plaintiff need not find "a case directly on point, . . . existing precedent must have placed the . . . constitutional question beyond debate." *al–Kidd*, 131 S.Ct. at 2083. Moreover, force involved here was not so egregious that the general constitutional law applies with "obvious clarity." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). As the Ninth Circuit has recently cautioned, "[t]he farther afield existing precedent lies from the case under review, the more likely it will be that the officials' acts will fall within that vast zone of conduct that is perhaps regrettable but is at least arguably constitutional. So long as even that much can be said for the officials, they are entitled to qualified immunity." *Hamby v. Hammond*, 821 F.3d 1085, 1091 (9th Cir. 2016).

The Court concludes that this case is one in which the officers conduct was regrettable and inappropriate – but at least arguably constitutional. In the absence of any factually analogous case law, the Court cannot conclude that the unconstitutionality of the use of force was "beyond debate." Accordingly, the officers are entitled to qualified immunity and the Court must grant defendants' Motion for Summary Judgment on the excessive force claim.

**6.    Count VII – Negligent Failure to Train, Supervise**

Plaintiff also raises a claim against Lieutenant John Kempf for failure to train and supervise the officers. We surmise that Plaintiff intended to plead this claim under both 42 U.S.C. § 1983 and the Idaho Tort Claims Act, but that was far from obvious in the Complaint, which expressly references only the Idaho Tort Claim Act. *Compl.* ¶ 160. In

contrast, Plaintiff's response to the Motion for Summary Judgment addresses only §

1983, ignoring the state claim altogether. Despite these frustrating discrepancies,

defendants brief the issue under both state and federal law and the Court will follow suit.

> A.    *Section 1983*

Moreno alleges that defendant Lieutenant John Kempf failed to properly train and

supervise Officers Blackhawk and Olsen, resulting in a violation of Moreno's

constitutional rights.

At the outset, the Court must clarify the relevant legal standard. It is true, as

Plaintiff argues that "[s]upervisors can be held liable for: (1) their own culpable action or

inaction in the training, supervision or control of subordinates; (2) their acquiescence in

the constitutional deprivation in which a complaint is made; or (3) for conduct that

showed a reckless or callous indifference to the conduct of others." *Cunningham v.*

*Gates*, 229 F.3d 1271, 1292 (9th Cir. 2000). However, *Cunningham* merely identified

three types of supervisory liability; it does not purport to establish the standard for each.

Count VII of Plaintiff's Complaint alleges only that Kempf "failed to train and

supervise" the other defendant officers. Plaintiff now appears to expand that claim to

include other supervisory theories—failure to intervene, acquiescence, or reckless or

callous indifference—but that too was far from obvious in the Complaint. A complaint

must set forth "'a short and plain statement of the claim' that will give the defendant fair

notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v.*

*Gibson*, 355 U.S. 41, 47 (1957) (quoting Fed. R. Civ. P. 8(a)(2)).  Accordingly, the Court

will not entertain arguments in support of this claim not pertaining to Kempf's failure to train or supervise.[18]

To establish a § 1983 claim for failure to supervise or train, a plaintiff must show that: (1) the supervisor either failed to supervise or train the subordinate official; (2) the training deficiency is "closely related" to the violation of plaintiff's rights; and (3) the failure to train "amounts to deliberate indifference to the rights of persons" with whom those officials are likely to interact. *City of Canton v. Harris*, 489 U.S. 378, 388 (1989). A training deficiency is "closely related" if plaintiff's constitutional "injury would have been avoided" had the officials been properly trained. *Oviatt v. Pearce*, 954 F.2d 1470, 1478 (9th Cir. 1992). Furthermore, "a pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train." *Flores v. County of Los Angeles*, 758 F.3d 1154, 1159 (9th Cir. 2014).

With this standard in mind, the Court addresses the failure to train and failure to supervise theories in turn.[19]

**(1)    Failure to Train**

---

[18] To the extent that Kempf is listed as a defendant in the other Counts, he may be liable for constitutional violations which he actively participated. Defendants to not appear to challenge his direct involvement in each alleged violation. However, Kempf's direct involvement in the tracking, stop, arrest, and use of force against Moreno is not relevant to the failure to train/supervise claim. Accordingly, the Court will not consider allegations of Kempf's direct involvement here.

[19] This claim is predicated on the Court's determination that those being supervised or trained actually violated Plaintiff's constitutional rights. The Court concludes that the officer defendants did not violate Moreno's rights against compelled self-incrimination and coercive questioning, therefore any claim based on these violations fails. However, the Court concludes that Moreno has established at least a material dispute of fact as to the remaining violations.

Plaintiff alleges that Kempf: (1) failed to train officers under his supervision that sexual contact with a defendant is inappropriate; (2) failed to train them properly in the policies and procedures of the ISP; (3) improperly trained officers to obfuscate the truth in report writing. No evidence is provided to substantiate the first two claims. For example, Plaintiff does not put forth any evidence regarding what training the officers received on sexual misconduct, how this training was inadequate, or how Blackhawk's actions were caused by any training deficiencies. All of the evidence before the Court suggests that Blackhawk knew that engaging in a sexual relationship with an informant was against the ISP's code of conduct. *See Blackhawk Dep.* p. 86-88. In fact, in response to the summary judgment motion, Plaintiff omits any discussion of the first two alleged training deficiencies. "[A] party opposing a properly supported motion for summary judgment may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). Accordingly, summary judgment is appropriate as to these alleged training deficiencies.

As for the third training deficiency, Plaintiff provides no evidence that it was "closely related to" the actual constitutional violations here—the unlawful GPS tracker search, Moreno's arrest, and use of excessive force. Plaintiff makes oblique references to two incidents of obfuscation: (1) obfuscation with regard to probable cause for the attempted stop of the Blazer; (2) obfuscation in the creation of police reports regarding the incident. As for the latter claim, it is implausible to suggest that the creation of

obfuscatory reports about the incident could have caused the deprivations themselves.[20] As for the first claim, Plaintiff argues that Kempf's "instruction or acquiescence in conducting an illegal stop of the gold Blazer" set off the entire encounter with Moreno in which her constitutional rights were violated. Setting aside the fact that there was no illegal stop of the Blazer, this "chain of events" theory is simply insufficient to establish the requisite causal nexus between Kempf's alleged training deficiencies and the violation of Moreno's constitutional rights. Even assuming the officer training on obfuscation somehow "caused" the violation of Moreno's rights, Plaintiff has also provided no evidence of pattern or practice to establish Kempf's deliberate indifference to potential constitutional violations, the third element of this claim.

Accordingly, the Court will grant summary judgment on Moreno's failure-to-train claim.

### (2)    Failure to Supervise

Plaintiff also alleges that Kempf failed to properly supervise Defendants Blackhawk and Olsen and that such failure proximately caused the deprivation of Ms. Moreno's constitutional rights. *Am. Compl. ¶¶* 153–59. Specifically, Plaintiff alleges that Kempf failed to "ensure they were not violating the Fourth and Fourteenth Amendments

---

[20] Moreno has not claimed that any action was undertaken on the basis of these allegedly obfuscatory police reports. Moreover, the creation of even a *falsified* police report would not by itself constitute a constitutional violation. *See Landrigan v. City of Warwick*, 628 F.2d 736, 744–45 (1st Cir. 1980) ("the mere filing of false police reports, by themselves without more, [does] not create a right of action in damages under 42 U.S.C. § 1983.").

[sic] of community members." *Am. Compl. ¶* 155.

Defendant moved for summary judgment on this claim and Plaintiff failed to substantively respond. *See Pl. Resp.* at 26–29, Dkt. 52 (omitting any mention of supervisory deficiencies). Merely reciting facts about Kempf's direct involvement in the encounter with Moreno is insufficient to make out the elements of a failure-to-supervise claim. Plaintiff failed to produce any evidence from which to conclude that Kempf's supervision was inadequate, that the failure to supervise caused any of the underlying violations, or that Kempf acted with deliberate indifference to the potential constitutional violations.

Accordingly, the Court will grant summary judgment on this claim.

**B.    *Idaho Tort Claims Act***

Plaintiff also alleges a violation of the Idaho tort Claims Act, Idaho Code Title 6, Chapter 9, against defendant Lieutenant John Kempf for the negligent failure to properly train and supervise Defendants Blackhawk and Olsen.

The Idaho Tort Claims Act ("ITCA"), specifically Idaho Code § 6–903, "establishes that governmental entities are subject to liability for their own negligent or wrongful acts, and those of their employees who were acting within the course and scope of their employment." *Hoffer v. City of Boise*, 257 P.3d 1226, 1228 (Idaho 2011). To establish a negligent supervision claim under § 6–903, a plaintiff must "present evidence to raise a genuine issue of material fact concerning whether those who had the duty to supervise should have reasonably anticipated that those subject to their supervision would

commit [a compensable tort]." *Kessler v. Barowsky*, 931 P.2d 641, 648 (1997) (citing *Doe v. Durtschi*, 716 P.2d 1238 (1986)).

Plaintiff's ITCA claim suffers from the same deficiencies as her § 1983 claim. She has not presented any evidence showing that Kempf failed to properly supervise Officers Blackhawk or Olsen. While Plaintiff does present some evidence of an alleged failure to train, the record provides no argument or evidence that Kempf should reasonably have anticipated that this training would result in the constitutional violations alleged here. Even if Kempf had gone so far as to instruct officers to falsify police reports, this misconduct would not by itself constitute a constitutional violation. *See Landrigan v. City of Warwick*, 628 F.2d 736, 744–45 (1st Cit. 1980) ("the mere filing of false police reports, by themselves without more, [does] not create a right of action in damages under 42 U.S.C. § 1983."). Accordingly, the court will grant summary judgment as to the ITCA claim.

**7.     State Law Claims in Counts II, IV**

Plaintiff also appears to have pleaded additional state law claims within Counts II and IV.[21] Defendants sought summary judgment on these claims and Plaintiff provided no response. Moreover, these claims fail as a matter of law, for several reasons. The state

---

[21] *See Compl.* ¶ 130 ("Further, Defendants violated State law and are subject to the laws of the State of Idaho for their actions in their official capacities as to the false and wrongful arrest."); *Compl.* ¶ 141 ("Defendants' negligent or otherwise wrongful acts or omissions in this case also violated laws of the State of Idaho, and Defendants are responsible under Idaho law for their actions in their official capacities within the course and scope of their employment.").

law claims are expressly pleaded against the defendants in their "official capacities" and must be dismissed on qualified immunity grounds. Second, Plaintiff cannot bring a claim under 42 U.S.C. § 1983 for a violation of a state law or constitution. Third, "this Court has repeatedly refused to recognize a 'direct cause of action for violations of the Idaho Constitution.'" *Johnson v. City of Caldwell*, No. 113CV00492EJLCWD, 2015 WL 5319012, at *17 (D. Idaho Sept. 11, 2015) (quoting *Campbell v. City of Boise*, 2008 WL 2745121, at *1 (D. Idaho July 11, 2008)). To the extent that Plaintiff attempts to plead a violation of a different state law, the Complaint fails to put Defendants on notice of what those claims might be. Accordingly, the Court grants summary judgment as to the state law claims pleaded in Counts II and IV.

## ORDER

**IT IS ORDERED:**

1.    Defendants' Motion for Summary Judgment (Dkt. 25) is **GRANTED**.

2.    Defendants' Motion for Partial Summary Judgment (Dkt. 42) is

     **GRANTED** as to:

        a.    All claims against Defendants Kempf, Olsen, and Blackhawk in their official capacity;

        b.    All claims against the State of Idaho and Idaho State Police;

        c.    Count I (unlawful search and seizure);

        d.    Count III (compelled self-incrimination, coercive questioning);

        e.    Count IV (excessive force); and

   f. State law claims pleaded in Counts II and IV.

3. Defendants' Motion for Summary Judgment (Dkt. 42) is **DENIED** as to the

  § 1983 claim in Count II (unlawful arrest).

4. Plaintiff's Motion for Summary Judgment re Tracking Device (Dkt. 43) is

  **DENIED**.

DATED: March 31, 2017

B. Lynn Winmill
Chief Judge
United States District Court